# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | |
|---|---|
| CORNUCOPIA CRUISE LINE, INC. ) | |
| D/B/A SULTAN PIER CORPORATION, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
| v. ) | No. 08-02864 |
| ) | |
| CUMMINGS MARINE, INC., ) | |
| ) | |
| ) | |
|    Defendant. ) | |

---

## ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Cornucopia Cruise Line, Inc. d/b/a Sultan Pier Corporation ("Cornucopia") brings this action against Cummings Marine, Inc. ("Cummings") for negligence that Cornucopia contends resulted in the destruction of its vessel the Diamond Lady. (See Compl., ECF No. 1.) On August 12, 2011, Cornucopia filed a Motion for Partial Summary Judgment on the issue of liability, and Cummings responded on September 9, 2011. (See Pl.'s Mot. for Partial Summ. J., ECF No. 36; Resp. in Opp. To Pl.'s Mot. for Partial Summ. J., ECF No. 44 ("Def.'s Resp.").) Cummings has moved for Partial Summary Judgment on the issue of damages. (See Def.'s Mot. for Partial Summ. J. on the Extent of Recoverable Damages, ECF No. 39 ("Def.'s Mot. for Partial Summ. J.").) Cornucopia responded on September 13, 2011, and Cummings

replied on September 25, 2011. (See Pl.'s Resp. to Def.'s Mot. for Partial Summ. J., ECF No. 45; Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. On the Extent of Recoverable Damages, ECF No. 49 ("Additional Facts").)

For following reasons, the Motions for Partial Summary Judgment are DENIED.

## I. Background[1]

Corncuopia is a corporation organized under the laws of New Jersey with offices in Perth Amboy, New Jersey. (Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ¶ 1, ECF No. 44-11 ("Def.'s Resp. to Pl.'s Statement of Facts").) Cummings is a corporation organized under the laws of Tennessee with offices in Memphis, Tennessee. (Id. ¶ 2.) Corncuopia owns and operates dinner and wedding cruise vessels in the New York and New Jersey areas, and is owned by Mustafa Kilic ("Kilic"). (Id. ¶¶ 3-4.) Kilic is experienced in buying and refurbishing vessels and does so on behalf of Cornucopia. (Id. ¶ 5.) From 2000 to the present, Cummings has operated a fleeting service on McKellar Lake, along the Mississippi River, near Memphis, Tennessee. (Id. ¶ 6.) Cummings is owned by George Cummings. (Id. ¶ 7.)

---

[1] Unless otherwise noted, the following facts are taken from the Undisputed Statements of Material Facts that both parties have admitted for the purpose of summary judgment. (See Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts and Def.'s Statement of Additional Facts, ECF No. 44-1 ("Def.'s Resp. to Pl.'s Statement of Facts"); Resp. to Def.'s Alleged Statement of Undisputed Material Facts, ECF No. 45-2.)

The subject of the parties' dispute is the Diamond Lady, a paddle wheel casino boat that was fleeted at Cummings' McKellar Lake facility between 2002 or 2003 and 2008. (Def.'s Resp. to Pl.'s Statement of Facts ¶¶ 8-9.) Kilic learned that the Diamond Lady was for sale by Isle of Capri Casinos, Inc. ("Isle of Capri Casinos") and went to the facility to look at the vessel in October of 2005. (Id. ¶ 10.) When Kilic examined the Diamond Lady, he found that, although the exterior of the vessel was dirty and the interior needed to be refurbished, the engines were in excellent condition. (Id. ¶ 11.)

The parties dispute whether the Diamond Lady could move under her own power in October of 2005 and whether she had been winterized. (Id. ¶ 14.) Kilic contends that the vessel had been winterized because he was told she had been by the previous owners, the Isle of Capri Casinos. (Kilic Dep. p. 15 October 12, 2010, ECF No. 37-1.) Cummings contends that the vessel had never operated under her own power while at Cummings' facility and was never winterized while in its facility because Cummings "had strict instructions from Isle of Capri" not to touch anything, despite repeated warnings about the need to winterize the Diamond Lady. (Cummings Dep. 43, ECF No. 44-2.) Cummings also contends that the Diamond Lady did not enter the facility under her own power. (Id. 105.)

Cornucopia and Isle of Capri Casinos executed a Bill of Sale on December 29, 2005, and title and risk of loss for the Diamond Lady passed to Cornucopia on January 13, 2006.[2] (Def.'s Resp. to Pl.'s Statement of Facts ¶ 14; Protocol of Delivery and Acceptance, ECF No. 44-4.) Cummings and Cornucopia entered into a fleeting lease on January 12, 2006, commencing on January 17, 2006, by which Cummings leased fleeting space for the Diamond Lady.[3] (Cummings' Dep. 48-49; Def.'s Resp. to Pl.'s Statement of Facts ¶ 16). The vessel remained at the McKellar Lake facility until March of 2008. (Id. ¶ 17.)

This suit arose because of damage to the Diamond Lady due to conditions at the McKellar Lake facility. Buried in the ground at the facility were several anchors. (Def.'s Resp. to Pl.'s Statement of Facts ¶ 18.) Because McKellar Lake is fed by

---

[2] In its response to Cummings' Motion for Summary Judgment, Cornucopia contends that it obtained possession of the Diamond Lady on December 29, 2005. (Pl.'s Resp. to Def.'s Alleged Statement of Undisputed Material Facts ¶ 6, ECF No. 46-2.) Cornucopia cites page 20 of Kilic's deposition to support its claim that Cornucopia took possession of the Diamond Lady on December 29, 2005, but there is no such statement in Kilic's deposition. The Local Rules mandate that disputed facts "be supported by specific citation to the record." W.D. Tenn. Civ. R. 56.1(b). Because it has provided no evidence that it took possession of the Diamond Lady on December 29, 2005, Cornucopia has admitted that it took possession of the vessel on January 13, 2006 for the purposes of summary judgment. See Akines v. Shelby Cnty. Gov't, 512 F. Supp. 2d 1138, 1147-48 (W.D. Tenn. 2007); see also George v. Vought Aircraft Indus., Inc., No. 3:08-0787, 2009 WL 5217002, at *4 n.2 (M.D. Tenn. Dec. 30, 2009) (applying similar local rule); Geesling v. Clay Cnty., No. 2:06-0056, 2007 WL 2509671, at *1 n.1 (M.D. Tenn. Aug. 30, 2007) (applying similar local rule).

[3] The parties dispute whether the lease was entered into on January 12, 2006, or January 17, 2006. (Def.'s Resp. to Pl.'s Statement of Facts ¶ 16). Cornucopia does not cite any evidence in the record to contest the fact that the lease commenced on January 17, 2006. Cornucopia did not object when George Cummings read aloud from the lease agreement at his deposition and stated that the fleeting agreement was entered on January 12, 2006, but commenced on January 17, 2006. (Cummings Dep. 48-49.)

the Mississippi River, its water level rises and falls with the river. (Id. ¶ 22.) Wires were used to move boats at the McKellar facility closer to or further from shore depending on the water level. (Id. ¶ 23.) The anchors were located approximately 200 to 300 feet from the water, and the wires connected the various boats at Cummings' facility to the anchors. (Id. ¶¶ 18-19.) Two wires were attached to the Diamond Lady's port and starboard bows, and a third was attached to the center bow. (Id. ¶ 18.) If the water level rose, vessels were pulled closer to Treasure Island; if the water level fell, the wires were extended and the vessels were moved away from the island. (Id. ¶ 23.) If vessels were kept close to shore as the water level fell, they could become grounded on the bank of the lake. If this occurred and a vessel was not moved before the water level rose, the vessel could become submerged. (Id. ¶ 24.) Under the fleeting agreement, Cummings had an obligation to monitor the rise and fall of the river and to adjust the shore wires. (Id. ¶ 25.)

At some point around the beginning of 2006, the lake's water level fell and the stern of the Diamond Lady became grounded. (Id. ¶ 26.) Cornucopia argues that the water level fell after January 13, 2006. When the water level rose, the Diamond Lady's engine room was flooded. (Id.) Cummings contends that the flooding took place before Cornucopia took

possession of the vessel and that it is not liable. (Id.) Both parties rely on a deposition given by James Peppers ("Peppers"), who was employed by Cummings as a deckhand between September 2006 and June 2006. Peppers testified that "maybe three or four weeks [approximately January 14, 2006] after Christmas Eve, the river started falling, and the Diamond Lady got on the ground." (James Peppers Dep. 16, ECF No. 36-4 ("Peppers Dep.").) However, in a letter that was introduced through Peppers' deposition testimony, he wrote that "[a]pproximately 1 to 2 weeks after Christmas the water started dropping . . . . After 2 to 3 days . . . [t]he water started rising. It covered the stern on the Diamond Lady, . . . [and] [i]t took approximately 13 hours to raise the Diamond Lady back up and pump the water out." (Peppers Dep. Exhibit D., ECF No. 44-5.) Two weeks after Christmas would be January 8, 2006, and so the situation described in Peppers' letter would have occurred before the leasing agreement commenced on January 17, 2006.

After the flooding, Cummings' employees raised and cleaned the Diamond Lady. (Def.'s Resp. to Pl.'s Statement of Facts ¶ 28.) Flooding had damaged the engine and bilges significantly. (Id. ¶¶ 32-35.) Before the grounding and flooding, the Diamond Lady's bilges were dry, with no evidence of oil leaking. The engines appeared to be in good condition. After the flooding, the engines, air compressors, and generators were damaged.

Cummings was unable to remove all of the water from the engines. (Id. ¶ 35.) Cummings recognizes that, if the vessel had been moved to safety as soon as she was grounded, the Diamond Lady would not have flooded. (Id. ¶ 31.)

In December of 2007 or January of 2008, the Diamond Lady was again submerged. (Id. ¶ 38.) Cummings admits that it had the responsibility to add slack to the cables when the water fell and that it did not do so. (Id. ¶ 41.) Cornucopia contends that the Diamond Lady broke loose on several occasions, hitting a dock on the other side of the Mississippi River, and that Cummings tied other vessels to the Diamond Lady, which struck the Diamond Lady and damaged the vessel. Cummings denies that this occurred. (Id. ¶¶ 47-48.) Cornucopia claims, and Cummings disputes, that equipment was stolen from the Diamond Lady while Cummings was under a duty to guard her. (Id. ¶¶ 48-50.)

Cornucopia contends that there is no issue of material fact about whether Cummings had a duty to fleet the Diamond Lady properly, that Cummings was negligent and breached that duty, and that its breach of duty was the actual and proximate cause of the damage. (Pl.'s Mot. for Partial Summ. J. 1.) Cummings has moved for summary judgment on the extent of recoverable damages.

Cornucopia purchased the Diamond Lady from Isle of Capri Casinos for $300,000. (Resp. to Def.'s Alleged Statement of Undisputed Material Facts ¶ 13, ECF No. 45-2.) Kilic testified that the Diamond Lady was worth $2 million to $3 million before she sank. (Kilic Dep. 35.) Although Kilic personally examined the vessel, he did not have a valuation made before his purchase and he does not know the last time the Diamond Lady operated under her own power. Before the boat was submerged, Cornucopia insured her hull for $300,000. (Pl.'s Resp. to Def.'s Undisputed Facts ¶ 21.) Cummings contends that the $300,000 insurance policy represents the fair market value for the Diamond Lady. (See Mem. in Supp. of Def.'s Mot. for Partial Summ. J. on the Extent of Recoverable Damages, ECF No. 41. ("Def's Damages Mem.").) Joseph Bauer ("Bauer"), claims adjuster for Zurich Insurance Company, which insured the Diamond Lady, testified that the $300,000 policy "had nothing to do with" the fair market value of the vessel. (Joseph Bauer Dep. 7-8, ECF No. 40-11 ("Bauer Dep.").)

Cornucopia contends that, without an appraisal of the vessel, it could not insure the Diamond Lady for more than the purchase price. (Kilic Dep. 90.) Cornucopia did not follow the advice of Sal Atanasio ("Atanasio"), one of its engineers, who

urged Cornucopia to have a valuation made before purchase.[4] (Atanasio Dep. 8, ECF No. 40-8.)  Stanley Johnson ("Johnson"), a marine surveyor hired by Cornucopia's insurance company to determine the extent of damage to the Diamond Lady, testified that it is probable the Diamond Lady's value has declined since she was bought because changes to gambling laws have reduced the need for casino boats.  (Stanley Johnson Dep. 98, ECF No. 40-10.)  Johnson stated that there is a market for casino boats like the Diamond Lady and that there "are quite a few of them on the market."  (Id. 140.)[5]  He noted that the market had changed significantly since 2005 because of changes in gambling laws. (Id. 98.)

Fred Budwine ("Budwine") is an expert witness for Cummings, a Certified Marine Surveyor, and the president of Budwine & Associates.  He concluded that the value of the Diamond Lady before sinking was $300,000, because the Diamond Lady was purchased in an arms' length transaction and was insured for

---

[4] Cornucopia claims in its Motion for Summary Judgment that Atanasio was an employee of Sultan Pier, a name under which Cornucopia does business. (Pl.'s Mem. in Support of Pl.'s Mot. for Partial Summ. J. 5, ECF No. 37.) In its response to Cummings' statements of undisputed facts, Cornucopia contends that Atanasio "always tries to sell his company" and did not actually believe a valuation was necessary.  (Pl.'s Resp. to Def.'s Alleged Statement of Undisputed Material Facts ¶ 24; Atanasio Dep. 3, ECF No. 40-8.) The parties do not proffer evidence or discuss Atanasio's relationship to Cornucopia in depth, and the relevant portions of the transcripts have not been provided.
[5] Cornucopia contends that Johnson meant that there were several vessels on the market now, not in 2005, when the boat was damaged.  (Id. ¶¶ 42-44.)

$300,000.  (Budwine & Assoc. Inc., Re: Cornucopia Cruise Line vs. Cummings Marine, ECF No. 40-12.)

Cummings also relies on the testimony of David Hawes ("Hawes"), Cornucopia's expert, who is a Senior Marine Surveyor for Crawford Company.  (Additional Facts ¶ 18.)  Hawes has provided valuations for more than a dozen vessels.  (Id. ¶ 19.) He opined that a vessel's sale price is not an accurate way to determine its value.  (Hawes Dep. 102, ECF No. 4-3.)  Hawes testified that he was aware of only one vessel comparable to the Diamond Lady, the Emerald Lady.  (Id. 106.)

Cummings argues that Cornucopia's recoverable damages are limited to the Diamond Lady's actual purchase price of $300,000, less the present scrap value of the vessel.  (Def.'s Mot. for Partial Summ. J. 1.)

## II.  Jurisdiction and Applicable Law

Cornucopia is a New Jersey corporation with its offices in New Jersey.  (Compl. ¶ 1.)  Cummings is a corporation incorporated under the laws of Tennessee with its principal offices in Tennessee.  (Id. ¶ 2.)  The amount in controversy exceeds $75,000.  This Court has diversity jurisdiction.  28 U.S.C. § 1332.

This court also has jurisdiction under admiralty law.  28 U.S.C. § 1333; (see Compl. ¶ 3.)  The tort "occurred on a navigable water," Jerome B. Grubart, Inc. v. Great Lakes Dredge

10

& Dock Co., 513 U.S. 527, 534 (1995), and "shows a 'substantial relationship to traditional maritime activity.'" Id. at 534 (quoting Sisson v. Ruby, 497 U.S. 358, 365 (1990)). Cummings' obligations encompassed "ordinary acts of ship maintenance which clearly fall within the category of repair work over which admiralty jurisdiction has traditionally been exercised." Coleman v. Slade Towing Co., 759 F. Supp. 1209, 1213 (S.D. Miss. 1991).

"With admiralty jurisdiction comes the application of substantive admiralty law . . . . Drawn from state and federal sources, the general maritime law is an amalgam of traditional common law rules, modifications of those rules, and newly created rules." East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 862-66 (1986). "Where the claim sounds in admiralty law, federal admiralty law must be applied." Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 131 (3d Cir. 2002). "Once the underlying cause of action has been found to constitute a maritime tort, the application of maritime law is mandated, claims of diversity jurisdiction notwithstanding." Bartel v. A-C Prod. Liab. Trust, et al., 461 F. Supp. 2d. 600, 603 (N.D. Ohio 2006) (internal quotations omitted). State law applies only "in the absence of an established federal maritime rule." Certain Underwriters at Lloyds v. Inlet Fisheries Inc., 513 F.3d 645, 649 (9th Cir. 2008); see also Gibbs, 314 F.3d at

132-33 ("[F]or cases such as this that sound in admiralty, we need not look to the general choice of law rules articulated in _Erie R.R. Co. v. Tompkins_, 304 U.S. 64 (1938).")  "State law defines what constitutes legal title [to a vessel] because contracts for the sale of a vessel are not 'maritime' and admiralty jurisdiction does not apply."  _El Fenix de Puerto Rico v. Gutierrez_, No. 9-1382, 1991 U.S. Dist. LEXIS 20857, at *11(D. P.R. Sept. 9, 1991) (citing _S.C. Loveland, Inc. v. East West Towing, Inc._, 608 F.2d 160, 164 (5th Cir. 1979)).

### III. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure mandates summary judgment when there is no genuine dispute as to any material fact.  The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine [dispute] of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion."  _Kochins v. Linden-Alimak, Inc._, 799 F.2d 1128, 1133 (6th Cir. 1986); _see_ Fed. R. Civ. P. 56(a).  The moving party can meet this burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of its case.  _See_ Fed. R. Civ. P. 56(c)(2); _Street v. J.C. Bradford & Co._, 886 F.2d 1472, 1479 (6th Cir. 1989).

When confronted with a properly supported motion for summary judgment, the respondent must set forth specific facts showing that there is a genuine dispute for trial. See Fed. R. Civ. P. 56(c). A genuine dispute for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). One may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Instead, the nonmovant must present "concrete evidence supporting its claims." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989) (citations omitted); see Fed. R. Civ. P. 56(c)(1). The district court does not have the duty to search the record for such evidence. See Fed. R. Civ. P. 56(c)(3); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). The nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in its favor. See Fed. R. Civ. P. 56(c)(1); InterRoyal Corp., 889 F.2d at 111. "Summary judgment is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive

determination of every action[,] rather than a disfavored procedural shortcut." <u>FDIC v. Jeff Miller Stables</u>, 573 F.3d 289, 294 (6th Cir. 2009) (internal quotation marks and citations omitted).

## IV. Analysis

Cornucopia has moved for partial summary judgment on the issue of liability. Cummings has moved for partial summary judgment on the extent of damages.

### A. Negligence

"[N]egligence is an actionable wrong under general maritime law," and its elements are "essentially the same as land-based negligence under common law." <u>Withhart v. Otto Candies, L.L.C.</u>, 431 F.3d 840, 842 (5th Cir. 2005). The plaintiff must show that "'there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by the plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'" <u>Great Lakes Dredge & Dock Co. LLC v. La. State</u>, 624 F.3d 201, 211 (5th Cir. 2010) (quoting <u>Canal Barge Co. v. Torco Oil Co.</u>, 220 F.3d 370, 376 (5th Cir. 2005)). In admiralty law, "the duty of care may be derived from: 1) duly enacted laws, regulations, and rules; 2) custom; or 3) the dictates of reasonableness and prudence." <u>Galentine v. Estate of Stekervetz</u>, 273 F. Supp. 2d 538, 544 (D. Del. 2003). A harm is a foreseeable consequence of an act or omission if it "'might

have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission.'" Great Lakes Dredge & Dock Co. LLC, 624 F.3d at 211-12 (quoting Consolidated Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 68 (5th Cir. 1987)).

Cornucopia contends that Cummings was negligent under the terms of their contract and should be liable for the damage to the Diamond Lady. (See Pl.'s Mem. in Support of Pl.'s Mot. for Partial Summ. J. 5, ECF No. 37.) Cummings contends that it is not liable because the vessel was already damaged when Cornucopia gained possession and title. (Def.'s Resp. 2.)

The contract between Cornucopia and Cummings was a bailment because Cummings was responsible for maintaining Cornucopia's property in good condition. In re Complaint of Ingram Barge Co., No. 05-4419, 2008 U.S. Dist. LEXIS 33421, at *19-20 (E.D. La. March 31, 2008). In a bailment relationship, "'the burden of proof of negligence is on the bailor, but by proving that the vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence.'" M/G Transp. Servs., LLC v. Northern Assur. Co., No. 09-7927, 2011 U.S. Dist. LEXIS 71280, at *5 (E.D. La. July 1, 2011) (quoting Stegemann v. Miami Beach Boat Slips, Inc., 213 F.2d 561, 564 (5th Cir. 1954)). "The [c]ourt must first determine whether the vessel was delivered in good condition." Id. at 6. Delivering the vessel in good condition

15

allows "the bailee [to] rebut the presumption of negligence only by demonstrating that . . . 'it exercised ordinary care.'"  Id. at 6 (quoting Sisung v. Tiger Pass Shipyard Co., 303 F.2d 318, 322 (5th Cir. 1962)).

Cummings does not dispute that it had a duty to maintain the vessel, but it contends that "the [Diamond Lady] was not in good condition when the bailment relationship commenced." (Def.'s Resp. 2) (emphasis in original).  It contends that the Diamond Lady "had already sustained its engine room damage . . . prior to the Plaintiff's taking title and possession of the vessel on January 13, 2006."  (Id. 2-3.) Cummings argues that the damage was done between the last time Kilic saw the vessel, in October 2005, but before the date title passed to Cornucopia. (Id. 3-4.)

On a motion for summary judgment the plaintiff must show that there is no "genuine dispute" about material facts. Pittman v. Cuyahoga County Dep't of Children & Family Servs., 640 F.3d 716, 721 (6th Cir. 2011).  "The court's function is not to weigh evidence, but to decide whether there are genuine issues for trial."  Bailey v. Golladay, 421 F. App'x 579, 581 (6th Cir. 2011).  The evidence does not establish, for purposes of summary judgment, that an express bailment existed at the time of the first flooding.  Id.  Both parties rely solely on Peppers' statements about when the Diamond Lady flooded, and his

statements are contradictory.  They narrow the period when the flooding occurred to January of 2006, but there is a genuine material dispute about the precise time.  There could be no express bailment before January 17, 2006, when the fleeting agreement went into effect, and Cornucopia did not gain title to the vessel until January 13, 2006.

Cummings had a duty to maintain the Diamond Lady.  "The standard of care imposed by a bailment is the same as exists in its absence."  <u>Frichelle Ltd. v. Master Marine, Inc.</u>, 99 F. Supp. 2d 1337, 1345 (S.D. Ala. 2000).  In <u>Kermarec v. Compagnie General Transatlantique</u>, the Supreme Court expressly held that parties always owe a "duty of exercising reasonable care under the circumstances of each case."  358 U.S. 625, 632 (1959); <u>see also</u> <u>Goldsmith v. Swan Reefer A.S.</u>, 173 F. App'x 983, 988 (3rd Cir. 2008) (internal quotations omitted) ("The General maritime negligence standard applicable to [a claim] is 'the duty of exercising reasonable care under the circumstances of each case.'").  "[W]hen neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law."  <u>Coastal Fuels Mktg. v. Florida Express Shipping Co.</u>, 207 F.3d 147, 151 (11th Cir. 2000); <u>see also</u> <u>McMellon v. United States</u>, 338 F.3d 287, 303

(4th Cir. 2003) (upholding use of state law when it does not frustrate national interests in uniform federal law).

The Diamond Lady was docked at Cummings' facility with its permission for the brief time before the contract became effective. The Diamond Lady was an invitee. A party acts unreasonably if it does not act even though "the foreseeability and gravity of the harm posed from a defendant's conduct . . . outweigh[] the burden on the defendant to engage in alternative conduct to avoid the harm." Arrambide v. Wal-Mart Stores, Inc., 33 F. App'x 1999, 201 (6th Cir. 2002). Cummings concedes that, if it had towed the boat out as the water level fell, the vessel would not have submerged. (Def.'s Resp. to Pl.'s Statement of Facts ¶ 31.) The vessel had been moored at the McKellar Lake facility since 2002 or 2003, and, at the time of the storm, the parties had contracted for services that would begin only a few days later. Cummings did not instruct Cornucopia to remove the Diamond Lady and bring her back on the date the fleeting contract took effect, but retained exclusive possession of the vessel.

Construing the facts in the light most favorable to Cummings, it is clear that its actions were unreasonable. Cummings was familiar with the danger posed if vessels were submerged. (Id. ¶¶ 44-45.) Even Cummings concedes that the Diamond Lady was worth a significant sum of money, at least

$300,0000.  (Def.'s Mot. for Partial Summ. J. 1.)  It consented
to Cornucopia's leaving the vessel at the McKellar Lake facility
and was responsible, in the ordinary course of its business, for
preventing vessels from becoming submerged.  Cornucopia had a
duty to prevent the vessel from submerging, which it breached
and which was the actual and proximate cause of the flooding of
the Diamond Lady.

Cornucopia has not established that Cummings' duty of
reasonable care extended to it.  Title and risk of loss passed
from Isle of Capri Casinos to Cornucopia on January 13, 2006.
(Protocol of Delivery and Acceptance.)  Before January 13, the
risk of loss was on Isle of Capri Casinos and the boat belonged
to it; Cummings had no duty of care to Cornucopia to maintain a
vessel it did not own.  See Farberewrke Hoeschst A.G. v. M/V
"Don Nick", 589 F.2d 795, 797 (5th Cir. 1979) (finding a party
could not bring suit in admiralty when it did not bear the risk
of loss for destroyed goods); In ex Trading Co. v. the Vessel,
Beate Oldendorff, 841 F. Supp. 1151, 1152 (M.D. Fla. 1993)
(finding that, under admiralty law, a party that lacked title
and did not bear the risk of loss at the time of an accident
lacked standing to sue).  When a party lacks title, it may not
sue on the loss.  Alaska Russia Salmon Caviar Co. v. M/V "Marit
Marersk,", No. 98 Civ. 7685, 2000 U.S. Dist. LEXIS 905, at *11-
12 (S.D.N.Y. Feb. 2, 2000).

The record is unclear about when the Diamond Lady was first flooded and how much damage was caused by that flooding. Peppers has identified a time during which the first flooding may have occurred. That time is not sufficiently specific to support a conclusion about liability because the flooding could have occurred before or after title passed. Cornucopia's Motion for Partial Summary Judgment on the issue of liability is DENIED.

**B. Damages**

It is well settled that, "[i]n case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction." Standard Oil Co. v. S. Pac. Co., 268 U.S. 146, 155 (1925); see also Gaines Towing & Transp. v. Atlantia Tanker Corp., 191 F.3d 633, 635 (5th Cir. 1999). "When the cost of repairs to damaged property exceed[s] the precasualty value of the property, the damaged property is considered to be a constructive total loss." Crounse Corp. v. Vulcan Materials Co., 956 F. Supp. 1377, 1381 (W.D. Tenn. 1977).

"It is the plaintiff's burden to prove damages . . . . If the defendant [] provides evidence suggesting that the total value of the vessel is less than the cost of repairs, the plaintiff must rebut that evidence with proof of a higher market value." Tidewater Marine v. Sanco Int'l, Inc., 113 F. Supp. 2d 987, 1006 (E.D. La. 2000). "[T]he insured value is not

controlling as to fair market value." Id. The Court may use
any means to establish fair market value, "as long as its
judgment is reasonable." Id.

Cummings argues in its Motion for Partial Summary Judgment
on the Extent of Recoverable Damages that Cornucopia's
recoverable damages are "limited to the fair market value of the
vessel and its actual purchase price of $300,000 less the
present day scrap value of the vessel." (Def.'s Mot. for
Partial Sum. J. 1.) Interpreting the evidence and all
inferences drawn "in the light most favorable to [Cornucopia],"
Cummings' argument is not well taken. Matsushita Elec. Indus.
Co., 475 U.S. at 587.

"The purpose of compensatory damages in tort cases is to
place the injured person [] as nearly as possibly in the
condition he would have occupied if the wrong had not occurred.
That premise applies to cases that arise in admiralty." Ingram
Barge Co. v. Lewis & Clark Marine, Inc., 504 F. Supp. 2d 665,
678 (E.D. Mo. 2007). It is a long settled rule that "the
measure of damages for the total loss of a vessel is its market
value if, at the time of destruction, the vessel has a market
value." Standard Oil Co., 268 U.S. at 155 (1925). However,
"[w]here no market value has been established . . . the court
may also consider evidence such as replacement cost,
depreciation, expert opinion, the amount of insurance," and

other factors, Ingram Barge Co., 504 F. Supp. 2d at 678, so long as they are reasonable. Tidewater Marine, 113 F. Supp. 2d at 1005. "'The ascertainment of value is not controlled by artificial rules . . . [or] formulas.'" Id. (quoting Standard Oil Co., 268 U.S. at 156). The plaintiff bears the burden of proving damages. Id.; see also Caravel/Woodwind Charters, Inc. v. Tahoe Keys Marina, LLC, No. S-05-1435 FCD KJM, 2008 U.S. Dist. LEXIS 1308, at *28 (E.D. Cal. Jan. 8, 2008).

Kilic has testified that he thought the Diamond Lady was worth $2 million to $3 million. (Kilic Dep. 35.) Both parties contend that the vessel is a total loss. (Def.'s Mot. for Partial Summ. J. 7, Pl.'s Resp. to Def's Mot. for Partial Summ. J. 5.) To prevail on its Motion, Cummings must show that the Diamond Lady was worth no more than $300,000 even if all inferences are drawn in favor of Cornucopia.

To calculate a vessel's market value, courts rely on comparable, contemporaneous sales. See E. I. Du Pont de Nemours & Co. v. Robin Hood Shifting & Fleeting Service, Inc., 899 F.2d 377, 3789 (5th Cir. 1990); Schilling Enters., L.L.C. v. Superior Boat Works, No. 4:04CV343-D-D, 2006 U.S. Dist. LEXIS 67251, at *14 (N.D. Miss. Aug. 31, 2006); see also M/G-T Servs. V. Turn Servs., No. 00-2653, 2001 U.S. Dist. LEXIS 18579, at * 5 (E.D. La. Nov. 6, 2001) (finding sales over a year after a vessel sank were not sufficiently contemporaneous to be part of the relevant

market).  Cummings has not provided evidence of sales of comparable vessels or any estimate about what those vehicles cost.

Cummings relies on testimony from Johnson, an expert witness for Corncupia, who works as a Marine Surveyor.  Cummings contends Johnson testified that there is a market for casino vessels.  (Def.'s Mot. for Partial Summ. J. 14), but that he "couldn't find any comparable vessels."  (Johnson Dep. 93.) Johnson also testified that he "couldn't find a shipyard that could quote [a price].  There's nobody building boats like this anymore . . . .  Nobody knows [how much the boat would cost to build]."  (Id. 100.)  Cummings also relies on testimony from Hawes.  (Def.'s Mot. for Partial Summ. J. 14.)  Hawes testified that, "if there is [sic] a half-dozen [comparable vessels] for sale" he would "be very surprised."  (Hawes Dep. 113).

Cummings contends that the boat's true value was only $300,000 because Cornucopia "chose to insure the Vessel for the exact amount that [it] paid for it, $300,000.00."  (Def.'s Mot. for Partial Summ. J. 11.)  Courts may consider the amount of insurance on a vessel to determine its worth.  See E. I. Du Pont de Nemours & Co., 899 F.2d at 379; Ingram Barge Co., 504 F. Supp. 2d at 678; M/G-T Servs., 2001 U.S. Dist. LEXIS 18579, at *3.  Taken alone, however, the amount of insurance is not dispositive.  No court has considered the insured value of a

vessel as dispositive of its worth.  See, e.g., E.I. Du Pont de
Nemours & Co., 899 F.2d at 379.

There is also evidence that Cornucopia insured the Diamond
Lady for less than her actual value.  Bauer, the claims adjuster
for Cornucopia's insurer, Zurich Insurance Company, testified
that it is not unusual to insure a vessel that is "laid up . . .
[and] basically not in use" for less than its market value.
(Bauer Dep. 8.)   According to Kilic, Zurich Insurance Company
would only insure the boat for $300,000, the price Cornucopia
paid, because he had not had an appraisal done.  (Kilic Dep.
91.)   "[T]he insured value is not controlling as to fair market
value prior to the allision."  Tidewater Marine, 113 F. Supp. 2d
at 1005.

Cummings emphasizes that the Diamond Lady was purchased for
$300,000 and argues that the product of an arms-length
transaction should establish the fair market value.  (Budwine
Aff. 3.)   The purchase price of a vessel does not necessarily
establish its value for purposes of damages.  The cases tend to
be silent on this factor, focusing instead on the cost of
replacing the vessel.  E. I. Du Pont de Nmemours & Co., 899 F.2d
at 379.

A reasonable finder of fact could conclude that Cornucopia
would not have purchased the Diamond Lady if it had not believed
the vessel was worth more than $300,000.  Isle of Capri Casinos

did not intend to sell the vessel for top dollar.[6]  Kilic is a
successful businessman whose company, Cornucopia, owns several
dinner cruise liners in the New York and New Jersey area.
(Def.'s Reply to Pl.'s Rsep. To Def.'s Mot. for Partial Summ. J.
on the Extent of Recoverable Damages ¶¶ 1-3, ECF No. 49.)  He
has significant experience purchasing and operating ships.
Based on his experience, he testified that the Diamond Lady was
worth between two and three million dollars.  (Kilic Dep. 35.)
Viewing the evidence in the light most favorable to Cornucopia,
Cummings has not met its burden of showing that the Diamond Lady
was worth only $300,000.  Smith Wholesale Co. v. R.J. Reynolds
Tobacco Co., 477 F.3d 854, 861 (6th Cir. 2007).  Cummings'
Motion is DENIED.

## V.    Conclusion

For the foregoing reasons, Cornucopia's Motion for Partial
Summary Judgment is DENIED, and Cummings' Motion for Partial
Summary Judgment on the Extent of Recoverable Damages is DENIED.

---

[6] On December 8, 2011, the Court granted the parties joint motion to allow
Cornucopia to file a supplemental response to Cummings' Motion for Partial
Summary Judgment.  (Order Granting Joint Mot., ECF No. 57.)  The
Supplemental Response was filed on December 13, 2011, and included the
deposition of Richard Meister ("Meister"), the Vice President of Construction
and Design at Isle of Capri Casinos.  (Supp. Resp. of Pl. to Def.'s Mot. for
Partial Summ. J., ECF No. 59.)  Meister testified that Isle of Capri Casinos
was not concerned with obtaining market value for the vessel and that its
main concern was "that the vessel not be used for gaming and that the vessel
not be scrapped."  (Meister Dep. 24, ECF No. 59-1.)  Meister also testified
that Isle of Caprino Casinos did not have any appraisals or valuation surveys
conducted before the Diamond Lady was sold.  (Id. 26.)

So ordered this 9th day of March, 2012.

                              /s Samuel H. Mays, Jr.
                              SAMUEL H. MAYS, JR.
                              UNITED STATES DISTRICT JUDGE